1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| LINDSAY AMOS,<br><br>               Plaintiff,<br><br>    v.<br><br>KALAMA SCHOOL DISTRICT et al.,<br><br>               Defendant. | CASE NO. 3:24-cv-05335-DGE<br><br>ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT (DKT. NO. 22) |

## I.    INTRODUCTION

Plaintiff Lindsay Amos brings this action against her former employer Kalama School District and several District employees alleging that she is a whistleblower who was retaliated against for exposing unlawful practices.  She brings claims under the First Amendment, the Washington Local Government Whistleblower Protection Act, and state common law.  Before the Court is Defendants' motion for summary judgment.  The Court GRANTS the motion in part and DENIES in part.  Specifically, the Court holds that the speech Plaintiff claims was the basis for the retaliation is protected under the First Amendment, and that there is a material question of

fact as to whether the speech was a substantial or motivating factor of her involuntary transfer, precluding summary judgment. However, the Court finds that Plaintiff's claim under the Washington Local Government Whistleblower Protection Act is barred or abandoned, and grants summary judgment as to that claim. As to Plaintiff's claim of constructive, wrongful discharge in violation of public policy, Defendant only argued for summary judgment on that claim in a reply brief. Therefore, the Court will give Plaintiff an opportunity to respond before ruling on that issue.

## II.    PROCEDURAL HISTORY

Plaintiff initiated this action on May 3, 2024 (*see* Dkt. No. 1), but no motion to dismiss was filed. Accordingly, this motion for summary judgment is the first time this Court is reviewing Plaintiff's claims.

Plaintiff had a prehearing conference on her state law whistleblower act claim set before an Administrative Law Judge ("ALJ") on October 10, 2023. (Dkt. No. 23-1 at 77.) Plaintiff failed to appear. The ALJ then held her in default. (*Id.*) Plaintiff then moved to vacate that default, which the ALJ denied. (*Id.* at 82–84.) The ALJ explained that the reason Plaintiff failed to appear—"mistaken calendaring control by failure of [counsel's] iPhone alarm to notify him of the prehearing conference time"—was not a circumstance beyond the counsel's control and did not establish good cause for failure to appear. (*Id.* at 84.)

## III.    RELEVANT FACTS

Plaintiff Lindsay Amos began working for the Kalama School District ("KSD") as a classroom teacher in 2014, at the Kalama Elementary School. (Dkt. No. 22 at 2.) In 2016, she became a reading specialist. (*Id.*) Being a reading specialist was her "dream job." (Dkt. No. 26 at 2.)

Problems began to arise between Plaintiff and her employer starting in the 2022–2023 school year.  In December 2022, Defendant Principal Billina Dolezal and Assistant Principal Tiffany Fechter told Plaintiff to stop using a particular reading curriculum, Fountas & Pinnell, and switch to a different system.  (Dkt. Nos. 22 at 3, 23-1 at 7–8.)  Plaintiff expressed "shock" about the lack of communication regarding this change and "concern" about the new program.  (Dkt. No. 23-1 at 7–8.)

Starting in January 2023, Plaintiff began providing Learning Assistance Program ("LAP") instruction to a student, referred to by Plaintiff as "Girl #1."  (Dkt. No. 25 at 2.)  LAP is distinct from an Individualized Education Program ("IEP"); to provide the latter, a teacher must be trained in Specialty Designated Instruction ("SDI"), which Plaintiff was not.  (*See id.*)  Plaintiff became concerned that Defendants were not properly implementing the IEP by counting her LAP instruction time towards Girl #1's IEP; in other words, Plaintiff was concerned that Girl #1 was not receiving the full amount of IEP instruction that she was entitled to.  (*See id.* at 2, 4–5; Dkt. No. 26 at 2.)  Also in January 2023, Plaintiff was newly tasked with creating paraeducator schedules for reading interventions.  (Dkt. No. 22 at 3.)  But around the same time, Principal Dolezal apparently grew displeased with Plaintiff's job performance.  Dolezal, Fechter, and Plaintiff had a meeting (entitled "growth goal meeting") which grew contentious when Dolezal questioned Plaintiff's understanding of the LAP program and asked why Fechter had to do aspects of Plaintiff's job.  (*Id;* Dkt. No. 23-1 at 23–25.)  Dolezal also accused Plaintiff of "not supporting para[educators] or teachers" and Plaintiff pushed back on those concerns.  (Dkt. No. 23-1 at 29.)  Plaintiff felt "personally attacked," but the meeting "ended on a positive note" when Plaintiff was asked to cover transitional kindergarten specialist time.  (*Id.* at 25.)   After the meeting, it was agreed by email that Fechter would assist Plaintiff in preparing materials and

1   there would be weekly monitoring.  (Dkt. Nos. 22 at 3; 23-1 at 47.)  Plaintiff spoke with her

2   union representative and then with Dolezal about a new evaluation plan.  (Dkt. No. 23-1 at 25–

3   26.)

4          In March 2023, conditions escalated.  On March 15, Plaintiff had a meeting with special

5   education teacher Elizabeth Sheldon and other colleagues, where they discussed IEP issues.

6   (Dkt. No. 25 at 1–2.)  During that meeting, it was agreed that Plaintiff would no longer be

7   serving Girl #1, memorialized in an email from Sheldon.  (Dkt. No. 23-1 at 31; 29-1 at 78.)

8   Plaintiff characterized it as a "great meeting, very positive."  (Dkt. No. 23-1 at 31.)  But after

9   reaching the agreement that Plaintiff would no longer be serving that student, Sheldon asked

10  (according to Plaintiff) "how am I going to account for those IEP minutes?"  (*Id.*)  For Plaintiff,

11  "my red flag went off, like, whoa, whoa, whoa, whoa, whoa" because "when I was serving [the

12  student], I was unaware that her core instructional minutes were counting towards her IEP.  And

13  that cannot happen in LAP because I did not have any SDI from Ms. Sheldon."  (*Id.*)[1]  After

14  leaving the meeting, Plaintiff stated that she spoke with a school psychiatrist named Austin

15  Smith, who shared her concerns, and she called a co-worker after school, Teresa Burns, who also

16  shared her concerns.  (*Id.* at 32; *see also* Dkt. No. 26 at 2–3.)  Plaintiff stated that "at this point, I

17  did not feel comfortable going to Billina [Dolezal] or Tiffany [Fechter] because things had gone

18  south for so long," so she instead "did what teachers are allowed to do, and that's contact

19  OSPI"—the Washington Office of Superintendent of Public Instruction.  (Dkt. No. 23-1 at 33.)

20  Plaintiff characterized OSPI as a "go-to for seeking information," akin to an "insurance person"

21

22  _____

23  [1] Sheldon was asked in deposition if "when Lindsay was added on to [redacted's] team, IEP team in January 2023, it was your understanding that [redacted] would be getting her – would be getting some of her IEP minutes from Lind[s]ay Amos; correct?" and Sheldon responded "correct" and further stated this understanding came from Fechter.  (Dkt. No. 29-1 at 37–38.)

24

seeking advice from "the insurance commissioner." (*Id.*)  Plaintiff also stated she was never told not to contact OSPI.  (*Id.* at 38.)

Plaintiff sent an email to OSPI on March 16, 2023 at 12:12 p.m., which stated: "I am seeking clarification about IEP service minutes. If a child is on an IEP and it states that they are to receive 60 minutes of reading, do LAP services count towards those minutes?  Or are the LAP minutes in addition to the 60 minutes?  I want to make sure we are in compliance with all of this." (Dkt. No. 23-1 at 52.)  The next day, Plaintiff received a response from Jaimee Kidder of OSPI, who explained that a student with an IEP could receive SDI in an LAP group, but only if the instructor was appropriately qualified.  (*See id.*)  Plaintiff believed this confirmed her suspicions; LAP instruction provided by Plaintiff could not count towards a student's IEP time, because Plaintiff was not a certified instructor.  (*See* Dkt. No. 26 at 3.)  Plaintiff shared this information with Burns sometime between March 18 and 21.  (*Id.*at 5.)  Plaintiff stated she had no objection to "double-dosing," meaning providing a student with both IEP and LAP time, but her concern was that the students at issue were "not considered double-dosed" and so their time was not being properly accounted for.  (*See* Dkt. No. 23-1 at 34.)

On March 27, 2023, Burns stopped by Plaintiff's room and asked her to forward a copy of the OSPI email to her, which Plaintiff did that morning at 11:15 a.m.  (Dkt. Nos. 26 at 5; 29-1 at 73.)  Burns then forwarded it on to Fechter, the same day at 12:27 p.m.  (Dkt. No. 29-1 at 74.)  At 2:05 p.m. Fechter sent it on to Plaintiff's union representative Flowers, writing "I checked and the students in LAP are not being served their IEP minutes there according to Lizzie" [apparently a reference to Elizabeth Sheldon] and at 3:24 p.m. Fechter followed up: "To clarify they are being served their IEP minutes with Lizzie but not in LAP. That is an extra intervention they are receiving to support their needs."  (Dkt No. 29-1 at 62.)  Earlier on the same day, at 7:40 a.m.,

1  Dolezal began drafting a letter to Plaintiff involuntarily transferring her from reading specialist

2  to a first-grade classroom teaching position.  (Dkt. Nos. 22 at 5; 23-1 at 58.)  Dolezal worked on

3  the letter between March 27 and March 30, sharing it with Fechter and a union representative,

4  Kendi Flowers, both on March 27.  (Dkt. Nos. 22 at 5; 23-1 at 58–63.)

5      On March 29, Plaintiff states she was called into a meeting with Dolezal, Fechter, and

6  Burns, which "was unexpectedly very hostile" and the reassignment of Girl #1 was reversed;

7  Plaintiff raised concerns about counting her LAP minutes for this student's IEP time, but the

8  content of the OSPI email was not discussed.  (Dkt. Nos. 26 at 5–6; 29-1 at 77.)  Dolezal

9  acknowledged that she did ask Plaintiff why she went first to OSPI rather than discussing the

10  issue with Sheldon, because it was "staff norms" to "seek clarification when we are confused,"

11  but stated that it was "[n]ot that [Plaintiff] couldn't go to OSPI."  (Dkt. No. 31-1 at 28–29.)

12  Dolezal denied being upset about Plaintiff talking to OSPI, rather Dolezal was "seeking

13  clarification."  (*Id.*)

14      On March 30, Plaintiff received the involuntary transfer letter.  (Dkt. No. 23-1 at 68.)

15  The same day, Plaintiff was called into a meeting with Dolezal and her union representative

16  Flowers, where the news was delivered.  (Dkt. Nos 26 at 6; 28 at 5.)  The letter is signed by

17  Dolezal and states that while "I have respect for you as an educator and appreciate the work you

18  have put into our school . . . . [o]ver this past year it has become evident that your vision for LAP

19  programing and the requirements of LAP laid out by OSPI differ fundamentally."  (Dkt. No. 23-

20  1 at 68.)  It further states that "we are still hearing that you are requesting the lowest students be

21  served outside of LAP, or not served at all," and that Plaintiff failed to collaborate with other

22  staff as requested.  (*Id.*)  The letter acknowledged that the action was an involuntary transfer.

23  (*Id.*)  However, the move maintained her same level of salary.  (Dkt. No. 22 at 5.)  KSD

24

1    superintendent Eric Nerison approved the transfer.  (Dkt. No. 23-1 at 72.)  Plaintiff filed a

2    grievance alleging retaliation, but Nerison's successor, Jennifer McCallum, declined to reverse

3    his decision.  (*Id.* at 75; Dkt. No. 26 at 7.)  About 10 days after receiving the letter, Plaintiff took

4    FMLA leave through the end of the school year and did not return.  (*See* Dkt. No. 25 at 4.)  She

5    later resigned her position.  (Dkt. No. 29-1 at 71.)

6           Defendants contest that Plaintiff's email to OSPI was the cause of her involuntary

7    transfer.  They state that the timing of the email and the drafting of the involuntary transfer letter

8    makes it impossible that the email was the cause of the transfer.  (*See* Dkt. No. 22 at 5, 8.)  In

9    deposition, Defendants Dolezal and Fechter offered alternative reasons for the involuntary

10   transfer.  Fechter testified that Plaintiff "did not want to serve certain students because, either

11   they were multilingual, she felt that other kids – other staff members could serve them or that

12   they were low – too low."  (Dkt. No. 31-1 at 5.)  Fechter also stated that Plaintiff gave

13   "pushback" to giving students a "double dose," meaning reading support through both IEP and

14   LAP.  (*See id.*)  Plaintiff "complained about students" and other matters and refused to do data

15   entry and paraeducator support—forcing others to take on those tasks.  (*Id.* at 9.)  Because of

16   Plaintiff's refusal to work with "low" students, paraeducators were taking on that work, and

17   Plaintiff allegedly suggested—improperly in Fechter's view—that these students should be

18   assigned to "life skills"—a program more appropriate for "kids learning how to eat . . . kids

19   learning how to go to the bathroom . . . kids with feeding tubes."  (*Id.* at 12–13.)  There was a

20   particular multilingual student Fechter was concerned Plaintiff would not serve.  (*Id.* at 14.)

21   Dolezal gave very similar testimony, stating that Plaintiff "was often refusing to work with

22   students that were very low" despite her supervisors' requests for her to serve those students.

23   (*Id.* at 19.)  She raised the same concerns about not working with the multilingual student or

24

others, not helping paraeducators, and passing work off onto other staff.  (*Id.* at 21–23, 25.)

Dolezal stated that as far back as January she "started having conversations with Eric Nerison,

specifically, about a move for Ms. Amos" and Plaintiff's refusals to serve students "were

bringing me to that conclusion."  (*Id.* at 26.)  Dolezal stated it was her "right" under the CBA to

transfer Plaintiff.  (*Id.* at 26–27; *see also* Dkt. No. 29-1 at 66 (employment contract stating that

employees are "subject to assignment or reassignment of duties by the Superintendent . . . subject

to the limitations specified by statute.")).

Plaintiff denied refusing to serve students and denied that Dolezal or Fechter raised the

issue with her.  (Dkt. No. 23-1 at 30.)  She received a written performance evaluation in which

she was rated "proficient" in most categories, including "[h]elps others involved with the

student(s);" she was rated "distinguished" in categories including "[r]ecognizes and utilizes the

unique characteristics of each student," but she was rated "basic" in "[a]ssists teachers and

administrators" and other areas.  (*See* Dkt. No. 23-1 at 49–50.)

## IV.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, the discovery and disclosure materials

on file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c). The moving party is

entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

showing on an essential element of a claim in the case on which the nonmoving party has the

burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue

of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find

for the non moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986)(nonmoving party must present specific, significant probative evidence, not simply "some

1  metaphysical doubt."). *See also* Fed.R.Civ.P. 56(e).  Conversely, a genuine dispute over a

2  material fact exists if there is sufficient evidence supporting the claimed factual dispute,

3  requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty*

4  *Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors*

5  *Association*, 809 F.2d 626, 630 (9ᵗʰ Cir. 1987).

6          The determination of the existence of a material fact is often a close question.  The court

7  must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

8  e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254, T.W. *Elect.*

9  *Service Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor

10 of the nonmoving party only when the facts specifically attested by that party contradict facts

11 specifically attested by the moving party.  The nonmoving party may not merely state that it will

12 discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

13 to support the claim.  *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).

14 Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not

15 be "presumed."  *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–889 (1990).

16                            **V.        ANALYSIS**

17 **A.  A Material Question of Fact Precludes Summary Judgment as to the First**

18        **Amendment Claim**

19          Defendants argue they are entitled to summary judgment on the First Amendment

20 retaliation claim because Plaintiff was not speaking on a matter of public concern in her OSPI

21 email. (Dkt. No. 22 at 7–8.)  In any event, they say, "[t]he evidence shows that the Defendant

22 administrators were planning to transfer her before even having any knowledge of the OSPI

23 email." (*Id.* at 2.)  On reply, Defendants advance the argument that Plaintiff was acting within

24

1    the scope of her job duties when she sent the OSPI email, so she is not entitled to First

2    Amendment protection.  (Dkt. No. 30 at 7.)  They again argue that she was not speaking on a

3    matter of public concern, and that the email was not a motivating factor in her involuntary

4    transfer.  (*Id.* at 8–9.)  Plaintiff argues her speech was on a matter of public concern, that she was

5    not acting within her job duties commenting on IEP because she was not an IEP instructor, and

6    the email was a motivating factor.  (Dkt. No. 25 at 6–9.)

7         The Ninth Circuit applies a five-factor test to First Amendment retaliation claims brought

8    by public employees, the first three of which are Plaintiff's burden:

> First, the plaintiff bears the burden of proof at trial of showing (1) that she spoke on a
> matter of public concern; (2) that she spoke as a private citizen rather than a public
> employee; and (3) that the relevant speech was "a substantial or motivating factor in the
> adverse employment action." If the plaintiff establishes such a prima facie case, the
> burden of proof shifts to the government to show that (4) "the state had an adequate
> justification for treating the employee differently from other members of the general
> public"; or (5) "the state would have taken the adverse employment action even absent
> the protected speech."

*Coomes v. Edmonds Sch. Dist. No. 15*, 816 F.3d 1255, 1259 (9th Cir. 2016) (quoting *Eng v.

Cooley,* 552 F.3d 1062, 1070–1072 (9th Cir. 2009)) (internal citations omitted).  All five factors

must be satisfied.  *Id.* at 1260.  Further, "the determination whether the speech in question was

spoken as a public employee or a private citizen presents a mixed question of fact and law" and

"the question of the scope and content of a plaintiff's job responsibilities is a question of fact."

*Posey v. Lake Pend Oreille Sch. Dist. No. 84,* 546 F.3d 1121, 1129–1130 (9th Cir. 2008).

     On the first two factors, the Court finds Plaintiff's speech related to a matter of public

concern, and that it was made outside the scope of her job duties, and therefore it is protected.

On the third factor, the Court finds that there is a material question of fact as to whether the

speech was a substantial or motivating factor behind the adverse employment action, and therefore, summary judgment must be denied.[2]

        1.   Legal Standard: Does *Garcetti* or *Pickering* Apply?[3]

In general, First Amendment retaliation claims by public employees are governed by *Garcetti v. Ceballos*, 547 U.S. 410 (2006). Under the *Garcetti* test, the first question is if the employee was speaking on a matter of public concern. *See id.* at 419. If yes, the second question is if the employee was speaking within the scope of their job duties. If yes, the speech is not protected. *Id.* at 421 ("when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.") If no, First Amendment protection applies. *See id.* at 422. Formal job descriptions do not control the analysis, because they "often bear little resemblance to the duties an employee actually is expected to perform." *Id.* at 424–425.

But at the outset, the Court notes that the Parties failed to brief a threshold question: does *Garcetti* apply to this dispute? Embedded within *Garcetti* is an important exception. Because "expression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-

---

[2] Defendants do not appear to contest that the involuntary transfer was an adverse employment action, only that the motive for it was retaliatory. (*See* Dkt. No. 22 at 2.)

[3] Defendants' moving brief failed to cite a single federal case for the relevant First Amendment standard, instead citing state cases that summarized federal law. (Dkt. No. 22 at 7–8.) Plaintiff's response cited the Ninth Circuit Model Jury Instruction 9.9 for the elements of the claim, but not the caselaw discussed in that instruction. (*See* Dkt. No. 25 at 5.) Neither party engaged with the question of how the First Amendment standard differs in academic contexts versus other areas of public employment. Ultimately, the Parties are reminded that "it is not the responsibility of the Court to conduct the legal research for the parties[.]" *Env't Furniture Inc. v. Bina*, No. CV 09-7978 PSG (JCX), 2010 WL 11549403, *9 (C.D. Cal. Aug. 10, 2010).

speech jurisprudence" the *Garcetti* Court limited its opinion in that context: "[w]e need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching." *Id.* at 425.  The Ninth Circuit has filed this void, holding that the more deferential legal standard that applied before *Garcetti*, that of *Pickering v. Board of Education.*, 391 U.S. 563 (1968), continues to apply in the academic context.  *Demers v. Austin*, 746 F.3d 402, 406 (9th Cir. 2014).

In *Pickering*, a schoolteacher who wrote a letter to a newspaper opposing the way in which the school district handled revenues was dismissed.  391 U.S. at 564.  The Court implemented a test balancing "the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568.  Applying that test, the speech was protected because "[t]eachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operations of the schools should be spent." *Id.* at 572.  Broadly, "a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." *Id.* at 574.

The Ninth Circuit explained how these two standards now coexist.  It held that "academic employee speech not covered by *Garcetti* is protected under the First Amendment, using the analysis established in *Pickering.*"  *Demers*, 746 at 412.  Further, the court took an expansive view of what counts as academic:

> [P]rotected academic writing is not confined to scholarship. Much academic writing is, of course, scholarship. But academics, in the course of their academic duties, also write memoranda, reports, and other documents addressed to such things as a budget, curriculum, departmental structure, and faculty hiring. Depending on its scope and character, such writing may well address matters of public concern under *Pickering.*

*Id.* at 416.  But in some cases concerning retaliation against teachers or school staff, the Ninth

Circuit has applied *Garcetti*, including, of particular relevance here, as applied to a teacher who

complained about an IEP program.  *Coomes*, 816 F.3d at 1259; *see also Posey*, 546 F.3d at 1123

(applying *Garcetti* to a school security officer's retaliation claim).

Under either standard, the Court must make a determination as to whether Plaintiff's

speech covers a matter of public concern, which is a threshold inquiry under both *Garcetti* and

*Pickering*.  If yes, Plaintiff has two paths to First Amendment protection: either her speech is

outside the scope of her employment, so it is protected under *Garcetti*, or it is within the scope of

her employment—and then it is still protected under *Pickering* if it is academic.  *See Demers*,

746 at 412; *see also Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527–528 (2022) (both

*Pickering* and *Garcetti* "suggest proceeding in two steps" where the first is official duties, and

the second is interest balancing).  Here, the Court finds that Plaintiff's speech was both on a

matter of public concern and outside the scope of her regular job duties, so it would be protected

even under *Garcetti*.

### 2.  Plaintiff Spoke On A Matter of Public Concern

At the first step of the analysis, the Court finds that Plaintiff's OSPI email covered a

matter of public concern.  In the Ninth Circuit, "public interest is 'defined broadly.'"  *Demers*,

746 F.3d at 415 (quoting *Ulrich v. City & Cnty. of S.F.*, 308 F.3d 968, 978 (9th Cir. 2002)).

"Speech involves a matter of public concern when it can fairly be considered to relate to 'any

matter of political, social, or other concern to the community.'"  *Id.* (quoting *Johnson v.

Multnomah Cnty.*, 48 F.3d 420, 422 (9th Cir. 1995)).  The "essential question is whether the

speech addressed matters of public as opposed to personal interest."  *Id.*  (quoting *Desrochers v.

City of San Bernardino*, 572 F.3d 703, 709 (9th Cir.2009)).  "Even if only 'a relatively small

segment of the general public' might have been interested in the subject of [plaintiff's] posts, that is sufficient." *Hernandez v. City of Phoenix*, 43 F.4th 966, 978 (9th Cir. 2022). By contrast, "speech deals with individual personnel disputes and grievances" such that "the information would be of no relevance to the public's evaluation of the performance of governmental agencies" is not a matter of public concern. *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983). In this inquiry, the court considers: "the content, form, and context of a given statement, as revealed by the whole record" and of these, content is most important. *Demers,* 746 F.3d at 415 (quoting *Connick v. Myers*, 461 U.S. 138, 147–148 (1983)).

Recall the content of the speech at issue:

I am seeking clarification about IEP service minutes. If a child is on an IEP and it states that they are to receive 60 minutes of reading, do LAP services count towards those minutes? Or are the LAP minutes in addition to the 60 minutes? I want to make sure we are in compliance with all of this.

(Dkt. No. 23-1 at 52.) The content of the message is concerned with whether the school complied with legal requirements governing individualized education programs for students with learning disabilities. Although the specifics of how certain minutes of instruction time are counted towards an IEP may be a niche issue, the overall subject matter of the school district's implementation of special education programs is undoubtedly a matter of "political, social, or other concern to the community." *Demers*, 746 F.3d at 415. The content of the message does not mention Plaintiff's personal grievances with the school district or the terms of her employment, but rather special education programs, which would be of interest to at least a segment of the broader community.

Defendants argue that "the email was not a whistleblower complaint, was not to report illegal activity, was regarding one singular student, and was not regarding a matter of public concern." (Dkt. No. 22 at 8.) The argument is not persuasive. The email was intended to clarify

1   whether Defendants were complying with the law.  And although Plaintiff was writing in

2   reference to her experience with one student: a) Defendants cite no authority holding that the

3   treatment of a particular student cannot be a matter of public concern, and b) the text of the email

4   asks about IEP implementation in general, with no reference to the student.[4]

5           This result is consistent with other cases on matters of public concern.  In *Posey*, the

6   Ninth Circuit held that a letter written by a school security officer to the school's chief

7   administrative officer and superintendent covered matters of public concern, where it alleged

8   various security shortcomings that needed correcting "before someone gets seriously hurt."  546

9   F.3d at 1124, 1129.  The allegations were a matter of public concern because they were "relevant

10  to the public's evaluation of the performance of the school's administration."  *Id.* at 1130

11  (cleaned up).  In *Demers*, the Ninth Circuit found that a plan a professor circulated for

12  reorganization in a communications school was a matter of public concern, rejecting the idea that

13  it was "of no interest to anyone outside a narrow 'bureaucratic niche.'"  746 F.3d at 416.  More

14  recently, the Ninth Circuit held that a math professor's criticism of changes to a math curriculum

15  was a matter of public concern.  *Jensen v. Brown,* 131 F.4th 677, 687 (9th Cir. 2025).  The Court

16  gleans from these precedents that critiques of how school administrators execute programs and

17  policies generally touch on matters of public concern.  That, together with the Ninth Circuit's

18  instruction to take a "liberal construction of what an issue of public concern is under the First

19  Amendment," *Demers*, 745 F.3d at 415, is enough at this step of the analysis.

20

---

21  [4] Defendants' reply states that Plaintiff "has conceded that she was not writing on a matter of
22  public concern" but cites no evidence.  (Dkt. No. 30 at 8.)  Plaintiff was asked in deposition "are
    you alleging that the inquiry that you sent to OSPI in March was a whistleblower complaint?"
23  and responded "[t]hat was not my intent of the email."  (Dkt. No. 23-1 at 43.)  But there is no
    legal requirement that Plaintiff needed to have the subjective intent to send a "whistleblower
24  complaint" at the time she sent her email.

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT (DKT. NO. 22) - 15

3.  <u>Plaintiff's Email Fell Outside Her Job Duties</u>

When Plaintiff emailed OSPI, she went outside of her chain of command to address her

concerns with school administration.  Under Ninth Circuit precedent, that takes her speech

outside the scope of her job duties.  "When a public employee communicates with individuals or

entities outside of his chain of command, it is unlikely that he is speaking pursuant to his duties."

*Dahlia v. Rodriguez*, 735 F.3d 1060, 1074 (9th Cir. 2013).  "If . . . a public employee takes his

job concerns to persons outside the work place in addition to raising them up the chain of

command at his workplace, then those external communications are ordinarily not made as an

employee, but as a citizen."  *Id.*  In *Dahlia*, the court commented that a police officer who took

his concerns to internal affairs "very well may have acted outside his chain of command," and

drew an inference in his favor.  *Id.* at 1077.  In *Freitag v. Ayers*, the court held that a corrections

officer acted outside the scope of her job duties when she complained about being sexually

harassed by male officers to a State Senator and the state Inspector General, writing "[i]t was

certainly not part of her official tasks to complain to the Senator or the IG about the state's

failure to perform its duties properly[.]"  468 F.3d 528, 545 (9th Cir. 2006).  These cases stand in

contrast to *Garcetti*, where a deputy in the Los Angeles County District Attorney's office

complained to his supervisors that he believed a deputy sheriff's affidavit was false, and that fell

within his job duties.  547 U.S. at 421.

*Coomes* presents an important caveat to this chain of command rule.  In that case, the

Ninth Circuit held that the director of a school's Emotional/Behavioral Disorders ("EBD")

program did *not* speak in a private capacity when she emailed parents of EBD students to express

concern with their EBD placements.  816 F.3d at 1264.  That was because "communicating with

parents about students' IEPs and their progress in the EBD program was part and parcel of

1    Coomes's job." *Id.*  In fact, in one of the emails, Commes stated "[a]s case manager, *it is my*

2    *role* to talk with parents about developments at school." *Id.*  Coomes also raised concerns about

3    the EBD program with her supervisors within the chain of command, and that was part of her job

4    too. *Id.* at 1263–1264.  Although *Coomes* is similar to this case in that both concern IEP

5    programs, the Court finds it is distinguishable.[5]  Here, Plaintiff went outside the chain of

6    command not to parents, or to others with whom she might ordinarily communicate as part of her

7    regular duties, but to a state regulator.  *See Minkley v. Eureka City Sch.*, No. 17-CV-3241-PJH,

8    2017 WL 4355049, at *13 (N.D. Cal. Sept. 29, 2017) (denying a motion to dismiss a special

9    education teacher's retaliation claim and distinguishing *Coomes* where plaintiff pled that she

10   contacted "not only parents, but also the Director of [a regional special education entity], the

11   County Coordinator for the [teacher support] program, the Board, and her union.").  Whereas

12   *Coomes* found that there was no triable fact question as to whether communication with

13   plaintiff's supervisors and parents fell within her job duties, *see* 816 F.3d at 1264, the Court

14   cannot say the same here with respect to Plaintiff's outreach to OSPI.

15          The content of the email and how it relates to Plaintiff's responsibilities is of course

16   relevant as well.  Plaintiff was a "reading specialist," and generally her job was to help students

17   advance their reading skills.  (*See* Dkt. Nos. 26 at 2; 23-1 at 3–4, 49.)  Figuring out how to

18   account for time to ensure that a student received their full allotment of IEP with other

19   instructors was not, on this record, so clearly within Plaintiff's ordinary responsibilities that

20   Defendants are entitled to judgment as a matter of law on this point.  In *Coomes*, plaintiff was

21   "part of the IEP team," and in fact directed the EBD program, so her complaints about IEP

22   implementation were part of her job duties, 816 F.3d at 1261–1262.  But here, Plaintiff contends

23

24   _____

     [5] Notably, neither party cited *Coomes* and Defendants did not argue that it controls here.

1  she was not part of the IEP team and IEP implementation was not her job. (*See* Dkt. No. 26 at 8)

2  ("School IEP policies and procedures were not part of my job duties as a teacher at KES. I had

3  nothing to do with creation, planning, or assignment of IEP.").  In fact, Plaintiff's animating

4  concern in sending the email was that she was *not* a qualified IEP educator, so her LAP

5  instruction time could not count towards an IEP. (*See id.* at 3.)  Moreover, the email was not "a

6  routine report, pursuant to normal departmental procedure" but addressed more "broad concerns"

7  with how the school was implementing these programs. *Dahlia*, 735 F.3d at 1075. *See also*

8  *Marable v. Nitchman*, 511 F.3d 924, 932 (9th Cir. 2007) (complaining about "allegedly corrupt

9  overpayment schemes" not part of job duties for Washington State Ferry engineer); *Freitag*, 468

10  F.3d at 545 (complaining about sexual harassment not part of job duties).

11      Thus, the Court finds that Plaintiff's communication fell outside the scope of her job

12  duties.

13      4.  Disputed Questions of Fact Preclude Summary Judgment on Retaliation

14      The Court now turns to the third factor of First Amendment retaliation against public

15  employees: whether the protected speech was a substantial or motivating factor.  As with the first

16  two factors, Plaintiff bears the burden on factor three. *Coomes*, 816 F.3d at 1259.  The protected

17  speech need not have been the *sole* factor animating Defendants' decision, so long as it was a

18  "substantial or motivating factor." *See id.*; *Hernandez*, 43 F.4th at 976.

19      Plaintiff relies on the fact that school administrators learned of her email to OSPI on the

20  same day that they started drafting the involuntary transfer letter. (Dkt. No. 25 at 8–9.)  In

21  Plaintiff's telling, these events were "nearly simultaneous." (*Id.* at 3.)  Defendants argue that

22  they could not haver retaliated on the basis of the OSPI email, because Dolezal started drafting

23  the transfer letter at 7:40 a.m. on March 27 and Burns did not forward the email to Fechter and

24

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT (DKT. NO. 22) - 18

Dolezal until 12:27 p.m. that day.  (*See* Dkt. No. 22 at 5, 8.)  Plaintiff argues that regardless, these events are close enough in proximity that for summary judgment purposes, a jury could draw an inference that they were related, and the email at least contributed to the transfer decision.  (*See* Dkt. No. 25 at 8–9.)  Plaintiff relies on *Coszalter v. City of Salem*, in which the Ninth Circuit stated "a plaintiff can introduce evidence regarding the proximity in time between the protected action and the allegedly retaliatory employment decision,' from which a jury logically could infer [the plaintiff] was terminated in retaliation for his speech."  320 F.3d 968, 977 (9th Cir. 2003) (internal quotations omitted).  However, in that case, the adverse action took place *after* the employer was aware of the protected speech at issue.  *Id.* at 970–972, 977; *see also Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 507 (9th Cir. 2000) ("when adverse employment decisions are taken within a reasonable period of time after complaints of discrimination have been made, retaliatory intent may be inferred").

Nonetheless, the timeline of events would allow a reasonable jury to infer that the OSPI email was a substantial or motivating factor in the transfer decision.  Plaintiff states in her sworn declaration that she told Burns about the OSPI email between March 18 and 21.  (Dkt. No. 26 at 5.)  Dolezal began drafting the involuntary transfer letter at 7:40 a.m. on March 27.  (Dkt. No. 23-1 at 58, 63.)  Plaintiff forwarded the email to Burns at 11:15 a.m. on the 27th, and Burns then forwarded it to Fechter and Dolezal the same day, at 12:27 p.m.  (Dkt. Nos. 26 at 5; 29-1 at 73, 83.)  It does not appear, from the materials submitted, that Burns was directly asked whether she spoke with Fechter or Dolezal about the OSPI email before forwarding it to them, which is a significant gap in the record.  (*See generally* Dkt. No. 31-1 at 35–46.)  Burns did state that "I know that when [Plaintiff] got the e-mail, she forwarded it to me, and I forwarded it to admin as I would with any information coming from OSPI"—suggesting she would pass information

1    regarding OSPI to the administration promptly.  (*See id.* at 38.)  What the record does make clear

2    is that Dolezal knew of the OSPI email before finalizing the transfer decision.  Dolezal

3    acknowledged that at a meeting on March 29 she asked Plaintiff why she reached out to OSPI

4    instead of talking to Sheldon first, as reflected in meeting minutes.  (*See* Dkt. Nos. 31-1 at 28–

5    29; 29-1 at 77.)  One day after that meeting, and three days after receiving the email, on March

6    30, Dolezal informed Plaintiff of the involuntary transfer.  (Dkt. Nos. 23-1 at 68; 26 at 6; 28 at

7    5.)  A reasonable jury could find that even if Dolezal had started forming an intent to transfer

8    Plaintiff as early as January, she did not act on that intent until the day she received the email,

9    and did not finalize the decision until after she knew of the email.  On these facts, and viewed in

10   the light most favorable to the non-movant, a reasonable jury ultimately could find the email

11   played a substantial or motivating factor in the transfer decision conveyed to Plaintiff on March

12   30.

13         As to the remaining two factors of the claim, for which Defendants bear the burden,

14   *Coomes*, 816 F.3d at 1259, Defendants have proffered evidence of alternative non-retaliatory

15   justifications for their decision to transfer Plaintiff, *see supra* Section III, but this likewise

16   presents a disputed question of fact as to Defendants' motives.

17                    5.   Defendants Are Not Entitled to Qualified Immunity

18         Finally, Defendants argue they are entitled to qualified immunity.  In the qualified

19   immunity analysis, the Court must not "frame the issues presented at "too high a level of

20   generality," and must "adequately adjust[ ] to account for [Defendants'] interests in avoiding

21   disruption to [the school's] operations under the *Pickering* test."  *Dodge v. Evergreen Sch. Dist.*

22   *#114*, 56 F.4th 767, 783–784 (9th Cir. 2022).  Because the public employee free-speech analysis

23   (under *Pickering*) "requires a fact-sensitive, context-specific balancing of competing interests,"

24

qualified immunity is often appropriate. *Id.* at 784. (quoting *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 980 (9th Cir. 1998)). Even still, plaintiff need not produce "a case directly on point" and "it is enough to show that 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Id.* (cleaned up).

Here, the Court asks whether it was clearly established that Defendants could not retaliate against Plaintiff for raising concerns with their implementation of special education programs outside her chain of command. The Court finds that it was clearly established at the time that Defendants could not do so, as the Ninth Circuit and Supreme Court have repeatedly held that educators and school employees can criticize school district policies and practices outside of their normal job duties and chain of command. *See Pickering,* 391 U.S. at 574*; Demers,* 746 F.3d at 412*; Dahlia,* 735 F.3d at 1074*; Posey,* 546 F.3d at 1129–1131*; see also Jensen*, 131 F.4th at 694 ("by the time of the alleged retaliation, *Pickering* had established that 'the preferable manner of operating the school system . . . clearly concerns an issue of general public interest.'"). Defendants' brief does not engage with any of these precedents and merely asserts that the right was not clearly established. (*See* Dkt. No. 22 at 11–12.)[6] Accordingly, the Court finds Defendants are not entitled to qualified immunity.

For all these reasons, summary judgment is DENIED as to Plaintiff's First Amendment Retaliation claim.

### B. Plaintiff's State Whistleblower Claim is Abandoned and Defaulted

---

[6] In fact, Defendants' moving brief names the wrong parties in the qualified immunity analysis, arguing that "no reasonable reading of that law could have put Scholz, Hill, or Jewell on notice that their conduct was unconstitutional"—three individuals who, it does not appear from the record, have anything to do with this case. (*See* Dkt. No. 22 at 12.) This boilerplate recitation, perhaps copy and pasted from a brief in another matter, is insufficient.

1    Plaintiff's complaint invokes Washington Revised Code § 42.41 et seq, the Local

2   Government Whistleblower Protection Act ("LGWPA").  (Dkt. No. 1 at 17.)  For at least two

3   independent reasons, the Court grants summary judgment on this claim.

4    First, Plaintiff's response to the motion for summary judgment casts doubt on whether

5   she is pursuing a claim under Section 42.41 at all.  She states that "Plaintiff is not suing the

6   District for a violation of [the Whistleblower Act], but using the local government whistleblower

7   statute as a "public policy" that employees have a right to question governmental actions."  (Dkt.

8   No. 25 at 14.)  This appears to be a reference to the "public policy" aspect of a common-law

9   claim for "wrongful discharge against public policy," *Rose v. Anderson Hay & Grain Co.*, 358

10  P.3d 1139, 1141 (2015).  In any event, Plaintiff's response to the motion for summary judgment

11  on the Section 42.41 claim is that she is not pursuing the claim, so the Court has no basis to deny

12  the motion.

13    Second, Plaintiff had an opportunity to be heard on her state whistleblower claim in front

14  of an Administrative Law Judge, and she defaulted.  (*See* Dkt. No. 23-1 at 77–86.)  Under state

15  law, "[t]he final decision of the administrative law judge is subject to judicial review under the

16  arbitrary and capricious standard."  Wash. Rev. Code § 42.41.040(9).  Plaintiff has not asked this

17  Court to review or reverse the default nor argued that the ALJ's decision was arbitrary and

18  capricious, and so the Court will not do so.

19    Defendants further argue that they are exempt from the requirements of the LGWPA

20  because they have promulgated their own whistleblower policy, and under Washington Revised

21  Code § 42.41.050 "[a]ny local government that has adopted or adopts a program for reporting

22  alleged improper governmental actions and adjudicating retaliation resulting from such reporting

23  shall be exempt from this chapter if the program meets the intent of this chapter."  (*See* Dkt. No.

24

22 at 14.)  However, the Washington Court of Appeals has held that a local whistleblower ordinance fails to "meet the intent" of the chapter when it fails to provide remedies that are required by state law.  *See City of Seattle v. Swanson*, 373 P.3d 342, 351–352 (Wash. Ct. App. 2016).  Under KSD's policy, an employee who reports an "improper governmental action" and believes they have been subject to retaliation has the right to request a hearing before an ALJ.  (*See* Dkt. No. 23-1 at 89–90.)

Here, the Court finds it unnecessary to determine whether KSD's policy "meets the intent" of the LGWPA, because Plaintiff received the same process she would have been entitled to under either the state law or the local policy: a hearing before an ALJ.  As already noted, she defaulted in that hearing and has not asked this Court to review that decision.  Thus any distinction between KSD's policy and the LGWPA is of no practical effect in this case, and the outcome is the same either way—Plaintiff has no further recourse in this Court.

For all these reasons, the Court grants summary judgment as to the Local Government Whistleblower Protection Act claim.

## C.  The Court Reserves Judgment as to Constructive Discharge, And Orders Plaintiff to Brief Why Summary Judgment Should Not Be Granted on That Claim

Plaintiff pleads a claim of "constructive discharge" under state law.  (*See* Dkt. No. 1 at 17.)  This appears to be a reference to a claim of constructive, wrongful discharge in violation of public policy under Washington common law.  *See Snyder v. Med. Serv. Corp. of E. Washington*, 35 P.3d 1158, 1161 (Wash. 2001) (en banc) ("Washington law does not recognize a cause of action for constructive discharge; rather the law recognizes an action for wrongful discharge which may be either express or constructive.").  Generally, employment is terminable at-will, but

there is an exception "where the discharge contravenes a 'clear mandate of public policy.'" *Id.* (quoting *Roberts v. Dudley,* 993 P.2d 901 (Wash. 2000)).  Plaintiff alleges that the policies violated include the Local Government Whistleblower Protection Act, *see supra*, and the Washington Constitution, Article I, Section 5 (Freedom of Speech).  (*See* Dkt. No. 1 at 17.)  But proving a violation of policy is not the end of the inquiry.  As the Washington Court of Appeals explained,

> To establish constructive discharge, an employee must show that an employer engaged in a deliberate act, or a pattern of conduct, that made working conditions so intolerable that a reasonable person would have felt compelled to resign. This is an objective standard and an employee's subjective belief that he had no choice but to resign is irrelevant.

*Barnett v. Sequim Valley Ranch, LLC*, 302 P.3d 500, 505 (Wash. Ct. App. 2013) (cleaned up); *see also* Wash. Pattern Jury Instructions 330.51, 330.52.

Plaintiff notes that Defendants' moving brief failed to move for summary judgment on this issue. (Dkt. No. 25 at 14–15.)  Defendants only raised the issue on reply.  (Dkt. No. 30 at 10–11.)  As such, Plaintiff did not have sufficient opportunity to respond in her responsive brief. *See also* Fed. R. of Civ. P. 56(f) (allowing courts to grant summary judgment on grounds not raised by a party after "notice and a reasonable time to respond").  Therefore, the Court will order supplemental briefing on this issue, per the terms provided in the Order below.

## VI.    ORDER

Defendants' Motion for Summary Judgment (Dkt. No. 22) is DENIED as to Plaintiff's First Amendment Retaliation claim and GRANTED as to her Local Government Whistleblower Protection Act claim. [7]

---

[7] Plaintiff also pled claims under § 1983 of unlawful policy or practice (*see* Dkt. No. 1 at 16–17), but states in her responsive brief that she is no longer pursuing those claims (Dkt. No. 25 at 9), so summary judgment is GRANTED as to those claims as well.

Plaintiff is ORDERED to file a supplemental brief, not to exceed 2,100 words explaining why summary judgment should not be granted as to wrongful, constructive discharge in violation of public policy, with citations to the record.  The brief shall be filed no later than **June 20, 2025**.

The Clerk is directed to calendar this event.


Dated this 30th day of May, 2025.


David G. Estudillo
United States District Judge

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT (DKT. NO. 22) - 25